LISA F. ROSENTHAL (BAR # 153320)
**LAW OFFICES OF ROSENTHAL & ASSOCIATES**
21601 Vanowen Street, Suite 208
Canoga Park, California 91303
Tel:(818) 348-2896 FAX (818) 348-1247

Attorneys for Plaintiff
Kelly Furie



FILED
SEP - 5 2014
CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
Deputy Clerk

UNITED STATES BANKRUPTCY COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| IN RE:<br><br>  RUSSELL FURIE<br>              Debtor<br><br>Kelly Furie<br>              Plaintiff,<br>vs<br>Russell Furie<br>              Defendant. | CASE NO: 2:13-bk-18101 BR<br>Adversary Number: 2:13-BK-1601BR<br><br>**Declaration of Plaintiff Kelly Furie**<br><br>**Trial Date: 10/22/14**<br>**Dept: 1668** |

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE:**

Plaintiff Kelly Furie respectfully submits this declaration:

1. I am a Plaintiff in the above-described action. I am familiar with the facts and circumstances forming the basis of

this lawsuit and have personal knowledge of the facts stated herein.

## Historical Facts

1. Russell Furie and I were married on November 2, 1996. We separated on September 26, 2009.

2. The purpose of the separation, was clear, Russ wanted to protect our marital assets, as our former landlord for A+ Teaching Supplies, Octagon in a lawsuit was suing me, and Russ wanted to protect all of our assets.

3. Attached hereto as Exhibit 1, is an email from Russ acknowledging this fact that the purpose of our separation was to protect the family and more specifically that the goal was:

"(1) Keep the family together (2) Make Kelly and the family collection proof; (3) Allow for Kelly to re-establish her credit;(4) Allow for Kelly to re-establish her ownership interests". (**See Exhibit 1 page 1**)

4. In an effort to protect the assets, we filed for legal separation on August 25, 2009. We entered into a settlement agreement in which all of the assets were awarded to Russ. See **Exhibit 2**.

5. Under this agreement, Russ acquired all of the community assets, including all interests in several profitable businesses, 100% ownership in RKF Investments Inc., 100% ownership interest in RK Furie Family Trust; the timeshare in

Laguna Beach, and most importantly the title to the family home located at 26808 Terravista Court in Canyon Country.

6. Russ knew that under this agreement he was getting all of the assets and he actually informed me in writing that he was aware that the agreement was unfair to me but that it needed to be done to "keep the family together". Russ confirmed this fact himself in an email to me dated September 1, 2009. See **Exhibit 3**.

7. Russ' email of September 1, 2009 referenced, and included as attachments, a Terms & Conditions For A Plus Teaching Supplies, my business, a Co-Habitation Agreement and A Marital Settlement Agreement, see **Exhibit 4**. We did not sign any of these agreements, the agreement we eventually did sign, at the request of Russ, was the judgment of legal separation, Exhibit 2.

8. Under the agreement that we did eventually sign, I waived my right to receive spousal support in exchange for being allowed to live in the family home, which was awarded to Russ, until our youngest child, Mackenzie turned 18 or until 2019. This was a long-term marriage, which would have allowed me to receive spousal support for life.

///

///

///

---

**Waiver of Spousal Support/Fraud**
**(11 USC §523(a)(4))**

9. Throughout our marriage, Russ was the primary wage earner in the family. When he was employed he would routinely make approximately $170,000 a year. He made enough funds to cover the mortgage and all of our family expenses, which totaled approximately $7,000.00 a month.

10. Throughout our marriage I earned very little money. During our marriage I opened up a teaching supply store in Canyon Country. The average income per year from this store was approximately $20,000.00 a year.

11. Prior to the legal separation judgment being signed and filed with the Court, my teaching supply store was loosing money. Russ would often give me money to pay the rent on the store and pay for supplies. Russ would call these payments as "loans" and stated I would owe the funds back to him. See **Exhibit 4 page 3.**

12. It should be noted that eventually I had to close the store, A+ Teaching Supply completely and this was done in October 2011.

13. I agreed with Russ that we should "separate" so as to protect the bulk of our assets from my creditors and to protect Russ. I was ok with this agreement as we would still be living together in the family home and Russ would be paying all of the

bills, including my car payment, the mortgage on the family home, and all of the bills. In short, the "legal separation" was not really a separation. It was a sham designed to protect our assets from my creditor Octagon.

14. Moreover, I trusted Russ to take care of the kids, and me as I loved him very much and he was my husband and father of my kids. Russ, during this time, would constantly tell me over and over and over again not to worry about money that he would provide for the children and me.

15. Russ convinced me that I had to waive my right to receive spousal support in the agreement. He told me not to worry about the waiver of spousal support as I would receive the equivalent of spousal support by the fact that he would be paying the mortgage on the family home and that he would be paying the electric bill for the house etc. and that I and the children would remain in the family home until our youngest daughter Mackenzie turned 18 years old. At the time of the agreement she was only 8 years old. And, most importantly, Russ stated that I should not be worried about the waiver of spousal support because we would still be living together. He often reminded me that the purpose of the agreement was to protect the assets from Octagon, my creditor.

16. Based upon Russ' statements to me as well as our children and his continued declarations by him that he was

trying to protect our assets, both verbally to me and our children and in writing, **Exhibits 1, 3 and 4**, I trusted him that he would take care of children and me and that he would provide a home for us until Mackenzie turned 18. So I waived my right to receive spousal support.

17. Russ even told our children that they should not worry, as we would be living in the family home and that we would be taken care of. See **Exhibit 5**

18. Had I known that this was all a lie and that Russ never intended to take care of children and me, I would never have waived my right to receive spousal support and I would never have allowed him to take all of the assets of the marriage, the family home, RKF Investments, RK Furie Family Trust, H Roth Management LLC.

19. I understand that under California law, specifically, Family Code §'s 4336 and 4337 respectfully, the family court in a marriage that is of 10 years or older, the court retains jurisdiction indefinitely to award spousal support and in the case of a marriage of 10 years or older the supported party, which would be me, is entitled to receive spousal support until death of either myself or Russ or I got remarried. See Family Code §'s 4336 & 4337.

20. Russ and I were married for 12 years and 10 months. Thus, pursuant to Family Code §'s 4336 and 4337 I would be

entitled to receive spousal support until either Russ or I died, or I got remarried. I have yet to get remarried and we are both still alive.

21. Since the judgment of legal separation was entered, Russ immediately stopped paying the mortgage on our family home and the home proceeded to go into default. It was eventually foreclosed upon in 2012.

22. Since the foreclosure I, and our two children have been residing with friends and have literally moved three times, often sleeping on the floor at our friend's houses, or on their couches.

23. I could not afford to rent an apartment on the child support that Russ was paying of $1,454.00 a month and pay for food, car insurance and all of the other essentials of raising two children.

24. I would often go without food so that I can pay for food for our children and ensure that they had clean and good clothes to wear to school.

25. I would often go without food so that I can have the necessary funds to ensure that our children enjoyed their life, our son Kyle can play baseball and our daughter Mackenzie can do ballet.

26. I would often sacrifice my life and my happiness so that my children could be happy, albeit living with others.

Case 2:13-ap-01601-BR   Doc 44   Filed 09/05/14   Entered 09/08/14 11:30:31   Desc
Main Document    Page 8 of 14

27. I never expected that I would be homeless and that I would go hungry. I trusted Russ when he repeatedly told me that he would take care of the children and me. I never expected that Russ would lie to me.

28. Russ never intended to pay the mortgage on the family home and allow the children and myself to reside there until Mackenzie reached 18. Russ never intended to share the community assets with me, and place my name back on all community assets as he stated he would in **Exhibit 1.**

29. After I noticed that Russ was not paying the mortgage on the home and we were going to be foreclosed, Russ and I, with counsel, renegotiated our agreement and on September 29, 2010 and October 26, 2010 to allow me to take over the family home as an asset and that Russ was going to bring the home current and then I was to take over the asset. See **Exhibit 6**

30. Again still trusting Russ that he was going to pay the mortgage current and allow me to refinance and/or do a loan modification to save the home for the children and myself to live in, attempted to get a loan modification.

31. Russ again lied to me and made me promises that he never intended to keep. Russ stopped me from doing a loan modification with IndyMac Bank. Russ told them that the asset belonged to him and that I have no right to modify the loan in any way. **See Exhibit 7.**

31. When I realized that Russ never had any intention of performing on any of his promises, I attempted to get the Court to either order Russ to the mortgage or in the alternative have the funds necessary to maintain the family home into a spousal support order. The Court, unfortunately, was unable to grant this request as the State Court stated in March 6, 2012 that I forever waived my right to seek spousal support. See **Exhibit 8 page 3-4.**

31. What is clear from the actions of Russ is that he never intended to allow me to reside in the home until our daughter Mackenzie reached 18 years of age. He never intended to allow me to save our home and do a loan modification. Russ only made those promises in an effort to induce me to waive my right to the community assets, RKF, H. Roth Management, RK Family Trust and the family home. He made those promises to induce me to relinquish all of my rights and interests in valuable assets to him with false promises. In short, Russ committed fraud.

32. And as a result of this fraud, I have lost the right to receive as spousal support approximately $4,709.00 a month, the amount that Judge Terrell in family court found would be due and owing as and for spousal support but for my relinquishment of spousal support based upon Russ' promises to me that induced me, to my detriment to waive spousal support. As a result I have suffered damages in the approximate amount of $565,080.00, which

equates to $4,709.00 a month for a minimum of 10 years or until our daughter Mackenzie would have reached the age of 18.

### Transfer Of RKF Assets

33. One of the assets that I, in reliance on the promises made to me by Russ, RKF Investments awarded to Russ in the judgment of legal separation was transferred by Russ to his father in an effort to avoid paying me child support.

34. I brought a motion for a turnover order of this asset to me.

35. The family Court found that this asset was valuable asset and had cash reserves of approximately $105,000.00. See **Exhibit 8 page 2.**

36. The Family Court, Judge Terrell made a finding the transfer of this valuable asset to Russ' father was fraudulent and ordered that the asset be turned over to me immediately. See **Exhibit 9**

37. Russ has not complied with this order, which is still in full force and effect. As Russ failed to disclose this transfer on the court on his bankruptcy schedules and has refuse to comply with this order, I request that the Court deny Russ a discharge and order that this asset be turned over to me forthwith.

///

///

## Child Support Arrears

38. The family Court has already adjudicated that Russ is to pay child support in the sum of $2,092.00 retroactive to August 1, 2011. This was based upon a motion filed by Russ to comply with the Appellate Court's ruling.

39. Based upon the finding that support is to be at the rate of $2,092.00 I have compiled the following spreadsheet of the support arrears currently owed. See **Exhibit 10**.

40. This chart clearly shows that when the support payments were ordered by Judge Terrell to be $2,136.00, Russ refused to comply with the order and paid what he felt like paying.

41. So doing simple math, the numbers are clear. From the original stipulated order of support of $1,454.00 per month, Russ should have paid for the period of January 2011-May 2014 the total sum of $58,160.00. He actually paid the sum of $50,387.28. He is in the arrears the sum of $7,772.72.

42. Now if you take the new order of $2,092.00 back to August 1, 2011 to present, he is in the arrears as follows:

The difference between $1,454.00/$2,092.00 is $638.00. Take $638.00 times 33 months (August 2011-May 2014) you get the sum of $21,054.00 in the arrears.

43. Now for the months of June, July and August 2014 since Russ is paying $1,635.00 he is in the arrears the sum of $457.00 for three months for the total of $1,371.00.

44. I request that this Court adopt the findings of the family court and find that Russ is in the arrears of child support in the sum of $30,197.72 and find that this support arrears is non-dischargeable pursuant to 11 USC §523(a)(5).

### Attorney Fees

45. Based upon the conduct of Russ, the family Court ordered Russ to pay to me as and for attorney fees the sum of $6,000.00. See **Exhibit 8 page 7 and 9 page.**

46. Russ has not paid this sum that has been ordered by the Court.

47. This sum was awarded to me by the family court during the course of our divorce proceeding and was not and does not qualify for alimony, maintenance or support within the definition of same, pursuant to 11 USC §523(a)(5).

48. Russ has been claiming that he has "overpaid" child support and is not in arrears at all. This statement is blatant lie. First, as you can see from **Exhibit 6**, Russ was already in 2010 in arrears in the sum of $10,000.00. He agreed to pay that sum and he did pay it albeit not in full. He has only paid approximately $5,750.00 of the $10,000 in arrears.

I therefore request that this Court grant me judgment as follows:

1.   That Russ, based upon his fraud owes me the sum of $565,080.00 and this sum is not discharged in this bankruptcy;

2.   That Russ is in the arrears in child support the sum of $30,197.72 and this sum is not discharged in this bankruptcy;

3.   That Russ owes attorney fees in the sum of $6,000.00 and this sum is not discharged in this bankruptcy.

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct. Executed this August 23, 2014.

_____
By: Kelly Furie
Declarant

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
21601 VANOWEN ST. SUITE 208 CANOGA PARK, CA. 91303

A true and correct copy of the foregoing document entitled (*specify*): <u>PLAINTIFF'S DECLARATION FOR TRIAL</u>

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that he following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL:**
On (*date*) 9/4/14 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

RUSSELL FURIE 26766 CLAUDETTE STREET, SUITE 415 CANYON COUNTRY, CA. 91351

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 9/4/14 | CLAUDIA ESPINOZA | *(signature)* |
|---|---|---|
| Date | Printed Name | Signature |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012     **F 9013-3.1.PROOF.SERVICE**
F901331